**In re TALK CITY, INC., Debtor.**

**No. 02–10861–CJK.**

United States Bankruptcy Court,
D. Massachusetts.

July 19, 2002.

Melvin Hoffman, Esq., for Debtor.

William Prickett, Esq., for LiveWorld, Inc.

---

**1.** The amount sought for turnover services is denied with prejudice as an administrative expense but without prejudice to assertion of those same costs as part of LiveWorld's prepetition claim.

### MEMORANDUM OF DECISION ON REQUESTS OF LIVEWORLD, INC. FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS

CAROL J. KENNER, Bankruptcy Judge.

The matters before the Court are seven requests by LiveWorld, Inc. ("LiveWorld") for allowance and payment of administrative expense claims. The claims arise from LiveWorld's operation and then turnover to the Debtor of Debtor's web site during the initial five months of this case. The claims total $442,547.23; the Debtor objects to all but $25,992.00 of this total. After an evidentiary hearing, the Court now makes the following findings and rulings and, on the basis thereof, will allow LiveWorld's administrative expense claims to the extent of $57,429.48, deny without prejudice the $72,200 sought for intellectual property licensing fees, and deny with prejudice the remainder.[1]

### FACTS AND PROCEDURAL HISTORY

LiveWorld created a web site known as talkcity.com in 1996. The web site is a "chat room" hosting site; its owner earns revenue by selling advertising (which appears on the pages of the site) and by selling subscriptions to certain of its users (who pay for the privilege of hosting their own chat rooms). LiveWorld owned and operated that site until May 16, 2001, when LiveWorld entered into a Purchase Agreement with the Debtor[2] and, pursuant to that agreement, sold the web site and its related assets to the Debtor. On the same date, the parties also entered into a Web Site Services and Maintenance Agreement

---

**2.** At the time of the transactions in May, 2001, the Debtor was known as MYESP Acquisition Corporation, Inc. It changed its name to Talk City, Inc. sometime before its bankruptcy filing.

and a Loan and Security Agreement. In these, they further agreed that LiveWorld would (1) service and operate the web site for the Debtor for $900,000 per year, to be paid at the rate of $75,000 per month, (2) have a security interest in most (if not all) of the Debtor's assets to secure the Debtor's obligations under the purchase and servicing agreements, and (3) while LiveWorld remained the web site servicer, keep actual physical possession of the physical and intellectual property comprising the web site.

In November and December, 2001, the Debtor failed to pay LiveWorld's monthly servicing fee, causing LiveWorld, on January 11, 2002, to declare a default and then, on January 18, 2002, to seize the web site and its assets as a remedy under its security agreement. LiveWorld already had possession and physical control of the web site, so the seizure was more legal than physical: now LiveWorld was purporting to hold and operate the site as its own and not as an agent for the Debtor. Accordingly, LiveWorld cut off virtually all the Debtor's electronic control of and access to the web site, directed the Debtor's account debtors to make payments to LiveWorld instead of the Debtor, and ceased taking direction from the Debtor as to the operation of the site. After some (inconsequential for our purposes) skirmishing between the parties in the state courts, the Debtor, on February 6, 2002, filed a petition under Chapter 11 of the Bankruptcy Code.

The next day, the Debtor commenced an adversary proceeding against LiveWorld (No. 02–1044) for turnover of the web site and related assets. The Court first heard the matter on February 11, 2002, on the Debtor's emergency motion (in the adversary proceeding) for a preliminary injunc-tion directing LiveWorld to turnover the web site and related assets to the Debtor and enjoining LiveWorld from interfering with Debtor's use the web site and assets. LiveWorld opposed turnover on several grounds, including: (a) that, by virtue of its exercise of rights on January 18, 2002, the assets now belonged to LiveWorld and not the Debtor, and therefore were not subject to turnover; (b) that the assets, if they were the Debtors, were subject to a security interest requiring adequate protection, and that the Debtor did not have the web site management expertise and wherewithal to provide such protection; and (c) that, by virtue of LiveWorld's reliance on the Debtor's hardware for its own, non-Talk City business, the hardware could not be returned to the Debtor's possession without irreparably harming LiveWorld's ability to carry on its other business. The Court denied this initial motion on the basis that, on a record that was then exceedingly unclear on both the merits and the balance of harms, the Court lacked confidence that a sudden and compelled turnover would not cause more irreparable harm—especially in potential loss of the web site's value (to the detriment of whichever entity it belonged to, LiveWorld or the estate), out also in possible harm to LiveWorld's non-Talk City business—than it would avoid.[3]

Three days later, the Debtor filed a new and more limited motion in the adversary proceeding, this time requesting an order that would (1) compel LiveWorld to give the Debtor the sole and exclusive ability to operate the web site and related hardware by means of remote "electronic access" through a "virtual private network" (VPN), a mechanism that would return the web site to the Debtor's control but keep Live-

---

**3.** The most apt metaphor was that LiveWorld and Talk City were Siamese twins, whose separation might damage both fatally.

World in possession of the hardware; and (2) prohibiting LiveWorld from continuing to interfere with the Debtor's collection of its accounts receivable, customer deposits, and other payments. In my absence, Judge Feeney heard that motion on February 20 and 26, 2002. She found that the proposed arrangement was feasible; determined that LiveWorld was no longer contending that it had title to the web site assets and therefore that the debtor was entitled to at least such turnover as was requested; determined that LiveWorld's security interest in the assets would be adequately protected after turnover; and, therefore, by her "Order Directing Live-World, Inc. to Permit Talk City, Inc. Access to Its Assets," allowed the motion. In relevant part, the order required Live-World to give the Debtor electronic access to the web site via a VPN and not to interfere with such access; it also established a schedule and protocol for the parties' negotiation of the manner in which electronic access would be established and control of the web site turned over to the Debtor. The order also stated:

6. LiveWorld shall not be responsible or liable for payment of any vendor costs associated with the operation of talkcity.com, including but not limited to any services provided by UUN-ET/WorldCom for the operation of talkcity.com.

7. As of the date of the provision of Electronic Access to Talk City as set forth in paragraph 2 above, LiveWorld shall not be obligated to provide any services to Talk City under the Web Site Services and Maintenance Agreement ... pending the Court's allowance of a motion by the Debtor to reject the Web Site Maintenance Agreement, including any operation, maintenance, support, training, consulting, development or any other services for Talk City unless and until LiveWorld and Talk City enter into a new agreement for the provision of such services, which both parties would need to agree to in writing, and provided that such agreement and payment for such services is approved by the Court. Unless the parties agree otherwise Live-World shall maintain possession of the physical infrastructure of the Acquired Assets [the web site and related assets purchased by the Debtor from Live-World on May 16, 2001]....

9.... The relief granted by this order is in the nature of preliminary injunctive relief subject to further order of the court and shall not constitute a final determination of the validity, priority, extent or amount of any secured claim by LiveWorld against the Debtor.

LiveWorld immediately set to work on planning and arranging for the establishment of electronic access and, by March 1, 2002, was ready and willing to provide access, though not on terms and in a manner that the Debtor found acceptable. Because of the parties' difficulties in negotiating differences as to the details of the turnover,[4] the Debtor, on March 15, 2002, filed a further Emergency Motion for Order Directing LiveWorld, Inc. to Permit Talk City, Inc. Access to its Assets. After a hearing on March 25, 2002,[5] the

---

4. These delays prompted the Debtor, on March 15, 2002, to file a further Emergency Motion for Order Directing LiveWorld, Inc. to Permit Talk City, Inc. Access to its Assets. On March 25, 2002, the Court entered a Further Order Directing LiveWorld, Inc. to Permit Talk City, Inc. Access to its assets, which resolved the parties' differences.

5. It was at this hearing, or another around this time, that the Debtor first took the position that LiveWorld had not perfected its security interest as to the web site assets (other than the equipment, as to which the Debtor does not challenge the existence of Live-World's security interest). Until then, and except with respect to certain accounts re-

Court entered a Further Order Directing LiveWorld, Inc. to Permit Talk City, Inc. Access to its Assets, which resolved the parties' differences, established a final protocol for establishment of Electronic Access, and set a 90–day deadline for completion of physical separation and turnover. Among other things, the order stated:

10. At the time that LiveWorld provides Talk City with Electronic Access, all www.talkcity.com services shall be fully operational and restored to the state they were in on January 17, 2002. . . .

11. LiveWorld and Talk City shall work diligently and cooperatively to effectuate the complete physical separation of all Talk City's assets from LiveWorld's assets in a manner which will cause no damage to these assets or serious disruption to either company's business. . . . Such complete physical separation shall occur within 90 days from the date or this Order.

The Debtor obtained electronic access only on April 3, 2002. The delay in establishment of electronic access was due principally to four factors: (1) the debtor's need to obtain its own license to run certain crucial software; (2) the Debtor's need to replace certain special disks; (3) disagreements between the Debtor and LiveWorld as to the manner in which the site needed to be configured in order to establish the Debtor's electronic access; and (4) disagreements between the Debtor and Li-

veWorld as to legal arrangements .that would govern their coexistence while the Debtor had electronic control of the site but LiveWorld still controlled the physical infrastructure. On the first three issues the delay was in large measure attributable to the Debtor's (understandable) lack of experience and readiness in matters that LiveWorld had until then managed for the Debtor, and of its need to come up to speed in much less time than, had time permitted, would reasonably have been allotted for the task. The remainder of the responsibility, especially for factors (3) and (4), is borne equally by the parties, a function of bad chemistry between them.

On April 3, 2002, with establishment of its electronic access, the Debtor took over the operation and servicing of the web site and has remained in electronic control of it ever since. Nonetheless, after April 3, 2002, LiveWorld continued to provide the Debtor with "bandwidth" (wire access to the Internet), which LiveWorld procured in its own name from a third party known as UUNet, Inc., with services related to management of the bandwidth, and with certain electronic services. LiveWorld also continued planning and arranging for complete physical turnover of the web site assets, a process that was completed on June 14, 2002.[6]

From the commencement of the case until April 3, 2002, LiveWorld operated the web site, such that, throughout this period, the site never "went dark" but continuously remained up and running Still, Live-

---

ceivable, LiveWorld believed, and the Debtor did not dispute, that it had a perfected security interest in all the Debtor's assets. LiveWorld now concedes that its security interest was, as of the commencement of the case, unperfected except as to the equipment, and therefore that its prepetition claim is a secured claim under 11 U.S.C. § 506(a) only to the extent of the value of the equipment.

6. LiveWorld's final request for payment of administrative expense claim, dated and filed June 14, 2002, includes all expenses of turnover that, as of the date of the request, LiveWorld had not yet incurred but anticipated incurring before the turnover process was complete. By order of this Court dated March 25, 2002, physical separation was to be completed within 90 days of that order.

World did not during this period operate the site *at the Debtor's request*; the Debtor had demanded only turnover of the site. Nor did the Court order LiveWorld to operate the site during this period. And, in operating the site during this period, LiveWorld took no direction from the Debtor but continued to operate the site under LiveWorld's sole control. The parties agree that their Web Site Services and Maintenance Agreement was terminated prepetition, so LiveWorld does not contend that it rendered these services out of obligation under that Agreement.

LiveWorld no longer contends that it was the owner of the web site assets at the time of the bankruptcy filing. It concedes that the Debtor continues to own the assets. It also concedes that, except with respect to such of its collateral as is equipment, its security interest was not perfected as of the commencement of the case and therefore is subject to the interests of the Debtor–in–Possession, exercising its strong-arm powers under 11 U.S.C. § 544(a). The Debtor agrees that LiveWorld's security interest is valid against the bankruptcy estate only with respect to the equipment.

Since April 12, 2002, LiveWorld has filed seven requests for allowance and payment of administrative expense claims, summarized in the following table:

| Date | Doc. # | Period | Components | | Amount |
|------|--------|--------|-----------|--|--------|
| 4/12 | 61 | 2/6–4/2 | bandwidth–UUNet<br>20% bandwidth mgmt. fee<br>web site operation services | $ 36,180.63<br>7,236.12<br>139,500.00 | $182,916.75 |
| 4/12 | 56 | 4/3–4/9 | bandwidth–UUNet<br>20% bandwidth mgmt. fee<br>electronic services [7] | $ 4,810.00<br>962.00<br>2,083.00 | $ 7,855.00 |
| 4/18 | 64 | 4/10–4/16 | bandwidth–UUNet<br>20% bandwidth mgmt. fee<br>electronic services<br>requested services | $ 4,810.00<br>962.00<br>1,583.00<br>6,900.00 | $ 14,255.00 |
| 4/26 [8] | 72 | 4/17–4/23 | bandwidth–UUNet<br>20% bandwidth mgmt. fee<br>electronic services | $ 4,982.97<br>996.59<br>2,583.00 | $ 8,562.56 |
| 5/21 | 100 | 4/24–5/21 | bandwidth–UUNet<br>20% bandwidth mgmt. fee<br>electronic services<br>requested services | $ 17,199.10<br>3,439.82<br>6,153.00<br>2,300.00 | $ 29,091.92 |
| 6/12 | 130 | 5/22–6/4 | electronic services | | $ 1,666.00 |
| 6/14 (amended 6/20) | 137<br>146 | 2/27–6/13 | turnover of electr. access<br>physical turnover<br>intellectual prop. licensing fees | $ 109,600<br>16,600<br>72,000 | $198,200.00 |
| | | | Total | | $442,547.23 |

7. "Electronic Services": this term refers to three services provided to the Debtor, allegedly by agreement, after turnover of electronic access and control: (1) Member–to–Member Support Board, at minimum of $10,000 for up to three months; (2) Logging Server, at $1,000/month; and (3) Back–Up Services, at $2,000/month.

8. By previous order, the Court has allowed $750.00 of this request; the rest remains under advisement. The allowed amounts are for electronic services, specifically logging server and backup services.

The Debtor has objected to each, taking the position that LiveWorld should be allowed an administrative expense claim of $25,992, itemized as follows: Bandwidth, $19,642; Logging Server, $1,250; Back-up Services, $3,000; Certain Consulting Services, $2,100. The remainder of the claims should be denied, argues the Debtor, for reasons specific to each category of expense. The Court will address these in six categories: the web site operation services; electronic access and physical turnover; bandwidth and bandwidth management; electronic services; requested services; and licensing fees.

### 1. *Web Site Operation Services*

LiveWorld first seeks $139,500 for its operation and servicing of the web site from the commencement of the case to April 3, 2001, the date on which the Debtor obtained electronic access (remote electronic control of the web site) and effectively replaced LiveWorld as operator of the web site. LiveWorld also seeks $36,180.63 as reimbursement for bandwidth charges it incurred to UUNet for the web site in this period, and $7,236.12 as a bandwidth management fee for this period.

The Debtor opposes the servicing and bandwidth charges for this period on several grounds. First, the Debtor argues that the charges are not administrative expenses at all because (1) they were not provided at the Debtor's request, (2) they were not beneficial to the estate, and (3) LiveWorld undertook to provide these services solely to further its own interest— specifically, to preserve the going-concern value of the site for LiveWorld. Second, the Debtor contends that, even if the web site servicing charge is an administrative expense, the $75,000 monthly rate at which

LiveWorld values its services is excessive, as evidenced by the fact that Debtor has now retained a new web site servicer at the rate of only $40,000 per month. Third, the bandwidth and bandwidth management charges are excessive.

The Court begins with the Debtor's contention that these charges are not administrative expenses within the meaning of 11 U.S.C. § 503(b)(1)(A) because they were not provided at the Debtor's request. The premise of this argument is that, in order for a provider's service to constitute an administrative expense under § 503(b)(1)(A), the service must be one that the Debtor contracted for or at least requested, not one provided in opposition to the Debtor's demand for turnover. The Court agrees with this premise as a statement of the law. In a Chapter 11 case, the responsibility for administering the estate and its assets is assigned in the first instance to the trustee or (in the absence of a trustee) the debtor-in-possession. 11 U.S.C. §§ 1108 (the trustee may operate the debtor's business) and 1107(a) (subject to certain limitation, a debtor-in-possession shall have all the rights of a trustee serving in a case under this chapter). Where a third party exercises control over estate assets in a manner that the debtor-in-possession has not requested, and in a manner that prevents the debtor-in-possession from carrying into effect other plans for the same asset, the charges for that service are not administrative expenses.

This is the rule that governs LiveWorld's operation of the web site during the first month of the case. The Debtor had demanded turnover of the web site and was at all times entitled to turnover as expeditiously as possible.[9] LiveWorld's

---

9. The Court's denial of Debtor's initial request for preliminary injunction requiring turnover

failure to commence the turnover at that time resulted in a delay of at least three weeks in the turnover process. During those weeks, the site was administered in a manner inconsistent with the Debtor's plan for the site, which was to move the site to the control of an alternate servicer.

LiveWorld responds that the Debtor would somehow have had to keep the site in operation during this period, but also that the Debtor was not then ready to take control of the site, and therefore (Live-World implies) that LiveWorld was the only party that could have done so. The Court disagrees with this assessment of the facts. First, it is not clear that the Debtor would have kept the site in operation during that period if doing so had required (1) LiveWorld's continuing to operate the site at (2) a cost to the estate of $75,000 per month. The Debtor had at least two sound reasons to replace Live-World as its servicer: the inability of Live-World and the Debtor to get along; and Debtor's desire to reduce its monthly serving costs. Moreover, at LiveWorld's rates, the estate may not have been able to afford to operate the site during these months[10]; and it was obligated not to compound its prepetition insolvency with postpetition administrative insolvency. Second, although the Debtor was not ready on February 6 to take control of the site, it would have been ready several weeks sooner if the process had started immediately. And third, LiveWorld was not the only option for continuation of the site.

The Debtor retained an alternate servicer, at a much lower monthly rate, in fairly short order. Therefore, LiveWorld's continued operation of the site was not the only option, and its delay in commencing turnover interfered with the Debtor's plans (and right as administrator of the estate) to pursue other options.

At the beginning of the case, LiveWorld was under no obligation whatsoever to continue operating the site. The Court had not ordered LiveWorld to operate the site.[11] LiveWorld itself says that its prepetition Web Site Servicing Agreement with the Debtor had been terminated, so there was no longer a contractual obligation to provide service; LiveWorld's Chief Executive Officer credibly testified that, after the Debtor's prepetition default on its payments, LiveWorld knew that it had the option of simply discontinuing its servicing and operation of the site. And the Debtor did not ask LiveWorld to continue operating the site postpetition. LiveWorld's CEO testified that LiveWorld continued operating the site during this period in part because it believed that discontinuing its efforts would constitute a violation of the automatic stay. He did not elaborate as to the basis for that belief, and LiveWorld's counsel makes no argument to that effect. The belief was unfounded: the stay imposed no obligation on LiveWorld to continue operating the Debtor's site. During this time, Live-World was operating the web site by its own decision, not under obligation.[12] It

did not nullify the underlying statutory obligation of turnover. 11 U.S.C. § 542(a).

**10.** Everyone agrees that revenues for the period in which LiveWorld controlled the site were low, and that the administrative claims now at issue far exceed the estate's ability to pay, at least from its own reserves and near-term income. In fact, from other filings in this case, it appears that the Debtor remains administratively solvent only because a significant portion of its postpetition expenses are being born by a third party who is, in essence, funding this reorganization proceeding.

**11.** LiveWorld never sought a determination during this time as to whether it remained obligated to service the site.

**12.** During this period, LiveWorld was uncertain as to whether it was obligated to continue

could during this time have discontinued its operation of the site. For these reasons, the services and costs at issue are not administrative expenses.

█ Administrative expense status must also be denied as to these costs for a further and independent reason: that LiveWorld has not sustained its burden of showing that its operation of the site during this period "preserved the estate" to an extent that would justify fees in the amount of $182,916.75. Clearly, the services preserved, to some significant extent, the going-concern value of the site: had the site gone dark for an extended time, users would have gone elsewhere, and the value of the site to advertisers would have diminished considerably. But the Court has been presented with no evidence as to the value thus preserved. The going-concern value of the site is in large measure a function of the site's profitability, but LiveWorld has presented no evidence that the site was capable of being operated at a profit and that it had any value as an income-generating asset.[13] Certainly there was no evidence of the value of the site as of the beginning of the case, or as of April 3, 2002, the end of LiveWorld's servicing period. For these reasons, LiveWorld has not sustained its burden of showing that, and to what extent, its efforts preserved the estate. Much less has it shown any proportion between the value preserved and the fees and costs now being sought for its preservation.

For these reasons, the Court will deny the servicing fee and the associated band-width charges until April 3, 2002, the date on which the Debtor was given electronic control of the web site.

### 2. *Electronic Access and Physical Turnover*

█ In the request filed on June 14 and amended on June 20, 2002, LiveWorld seeks a total of $126,200 for the fees and expenses associated with turning over to the Debtor first electronic control of the web site ($109,600) and then physical control of the web site assets ($16,600). LiveWorld contends that these charges are properly deemed administrative expenses because they are for services that (1) were rendered postpetition and (2) benefitted the estate. The Debtor objects to allowance of these charges as an administrative expense because, if the Debtor is obligated to pay these charges at all, the obligation arose under the parties' prepetition Purchase Agreement and therefore is simply a prepetition claim, not an administrative expense. Moreover, argues the Debtor, insofar as LiveWorld relies on the turnover orders (of February 27 and March 25, 2002) as the basis for authority to recoup these charges as administrative expenses, the reliance is misplaced because the orders made no provision for compensating LiveWorld for the services at issue. LiveWorld has articulated no response to these arguments.

█ The Court agrees that the charges at issue are properly viewed as prepetition claims and not as administrative expenses.[14] Under the parties' prepetition

operating the site, but LiveWorld sought no clarification from the Court on that issue.

13. Given that LiveWorld chose to divest itself of the site in May of 2001, that the Debtor's obligation to pay the purchase price was contingent on profitability, that, by virtue of that contingency, no payment on the purchase price had yet become due, and that the Debt-

or filed a bankruptcy petition after operating the site for seven months, the Court sees no reason to *assume* that the site is capable of being operated at a profit or has a significant market value.

14. Because the charges are not administrative expenses, the Court need not now determine whether and in what amount they may be

Purchase Agreement, LiveWorld was obligated, upon request of the Debtor, to put the Debtor in actual possession and operating control of the purchased assets. Purchase Agreement, ¶¶ 1.1(b) and 1.8.[15] By agreement between the parties, LiveWorld retained possession of the assets after the closing, but LiveWorld remained obligated, on the basis of the prepetition agreement, to put the Debtor in actual possession and operating control of the assets if and when the Debtor so requested. Any right to payment that may have arisen from such turnover of possession and control was likewise rooted in the prepetition period: not only the purchase agreement, but also the Debtor's actual purchase of the assets. The fact that the transfer of control and possession did not occur until after the bankruptcy filing does not transform the claim into an administrative expense. As defined in the Bankruptcy Code, "claim" includes even rights to payment that remained contingent as of the date of the bankruptcy filing. 11 U.S.C. § 101(5)(A) (in the Bankruptcy Code, "claim" means right to payment, whether or not such right is fixed, contingent, matured, or unmatured); *In re CD Realty Partners*, 205 B.R. 651, 655 (Bankr. D.Mass.1997) (the Code defines "claim" broadly, as including a right to payment that remains contingent, in order to permit the broadest possible relief in bankruptcy). I therefore conclude that any amount that LiveWorld may be entitled to on account of its turnover efforts is a prepetition claim, not an administrative expense.[16]

### 3. *Bandwidth and Bandwidth Management*

 LiveWorld seeks to recover as an administrative expense both $31,802.07 in charges it incurred for purchasing bandwidth for the Debtor from April 3 (when the Debtor obtained electronic control of the web site) through May 21, 2002 and $6,360.41 in fees for its management of that bandwidth during the same period. The Debtor assents to $19,642 of the bandwidth charges but objects to the balance of the bandwidth charges and all of the management fee.

---

allowable as part of LiveWorld's prepetition claim.

15. In relevant part, paragraph 1.1(b) of the Purchase Agreement states:
   At any time and from time to time after the Closing, and upon request by either Party and without further consideration, each Party shall promptly . . . take such other action, as each Party may with commercial reasonableness request . . . to put the Buyer [the Debtor] in actual possession and operating control [of the Acquired Assets].
The language of paragraph 1.8, entitled "Further Assurances," is similar but more to the point:
   At any time and from time to time after the Closing, at the request of the Buyer and without further consideration, the Seller shall . . . take such commercially reasonable actions as the Buyer may reasonably determine is necessary . . . to place the Buyer in actual possession and operating control [of the Acquired Assets], including without limitation taking such commercially reasonable actions as the Buyer may reasonably request to transfer to the Buyer and the Buyer's designated employees and agents all information and know-how included in the Acquired Assets.

16. LiveWorld is not contending that anything in the Court's orders (requiring establishment of electronic access and then physical turnover) established that LiveWorld's turnover services and expenses would constitute allowable administrative expenses. Those orders simply clarified that LiveWorld could file motions for allowance and payment of administrative expenses. Except with respect to narrow categories of expenses and services (none of which are implicated here), the orders did not state that LiveWorld's services and expenses would constitute administrative expenses. The orders simply did not address that issue.

The facts are as follows. On June 15, 2001, the parties entered into a Bandwidth Agreement under which they agreed that (1) LiveWorld would, for the period from June 1, 2001 to June 1, 2002, purchase a minimum of 30 mbps of bandwidth from a bandwidth provider, UUNet Technologies, Inc., and (2) the Debtor would be responsible for reimbursing LiveWorld for the costs actually billed to LiveWorld under its contract with UUNet for a minimum of 20 mbps of such bandwidth (but more if the Debtor actually used more). In order to satisfy its obligations under this agreement, LiveWorld entered into a separate agreement with UUNet for provision of the necessary bandwidth for a period of time that included the period in question, April 3 through May 21, 2002. In negotiating the transfer of electronic control of the web site to the Debtor, the Debtor and LiveWorld agreed that, until the Debtor could procure bandwidth directly from UUNet, LiveWorld would continue to provide the Debtor with bandwidth. They did not agree on the price that the Debtor would pay for the bandwidth, nor did the Debtor specify (or even know) precisely how long it would be dependent in Live-World for its bandwidth. LiveWorld did supply the Debtor with bandwidth during this period, using bandwidth that it acquired for the Debtor under its already existing contract with UUNet, under which the applicable rate was $19,931.87 per month for the necessary bandwidth, the rate at which LiveWorld is now seeking reimbursement. The Debtor subsequently negotiated its own agreement with UUNet under which it was able to obtain the same bandwidth for $11,224.00 per month, commencing on or around on May 21, 2002. The Debtor's better rate was due, at least is part (the extent is not clear), from the fact that market rate for bandwidth was lower when the Debtor purchased its bandwidth than when Live-World entered into its agreement with UUNet.

The Debtor now argues that the value of the provided bandwidth is not $19,931.87 per month, but the lower rate reflected by the Debtor's own agreement with UUNet. LiveWorld contends that the Debtor should compensate LiveWorld at the cost to LiveWorld of the bandwidth. The Court agrees with LiveWorld. There is no evidence that LiveWorld could have renegotiated its contract with UUNet to obtain bandwidth for the Debtor at the lower rate; nor does the Debtor suggest that the rate obtained by LiveWorld from UUNet was excessive when it was negotiated. And, although there is evidence that the Debtor was able to obtain a better rate because the cost of bandwidth was lower when the Debtor purchased it, there is no evidence as to the price of bandwidth during the period at issue. LiveWorld provided this bandwidth as an accommodation to the Debtor; the Debtor must pay the cost to LiveWorld of that bandwidth.

The Debtor also objected to the bandwidth charges on three other grounds. The first two are that LiveWorld has not adduced the UUNet invoices for the bandwidth charges and that LiveWorld has not produced evidence that it actually paid the charges. These objections are now satisfied, LiveWorld having produced both invoices and evidence of payment.

█ The third is that some portion of the bandwidth for which compensation is being sought is bandwidth that the Debtor may not actually have used. The Court overrules this objection. As LiveWorld explained, a user of bandwidth needs to purchase enough capacity to handle the highest level of demand it might have to meet, even if it does not (and probably will not) actually use all that capacity. The UUNet invoice shows that LiveWorld pro-

vided the Debtor with the same capacity, 20 mbps, as the Debtor had, in the Bandwidth Agreement, agreed to obtain through LiveWorld. The Bandwidth Agreement is evidence that the Debtor had earlier deemed this capacity necessary for the operation of its web site, and no evidence has been introduced to show any change in that need, or in the Debtor's estimation of its need. There is no evidence that the Debtor asked for less capacity than it previously used. I conclude that the level of capacity that LiveWorld provided was necessary and actually used, in the sense that it was available to the Debtor should the Debtor need it.

■ LiveWorld also seeks compensation for its bandwidth management services during this period, which it values at twenty percent of the cost of the bandwidth. The Debtor objects on two grounds: it never agreed to such a fee, and the amount of the fee is unreasonable. The Court rejects the Debtor's objections. The Debtor asked LiveWorld to continue supplying bandwidth; this is not disputed. The bandwidth thus provided came from UUNet *via LiveWorld*, both physically and contractually. Some management service was necessary to supply the bandwidth requested, and the Debtor, having asked for the bandwidth, cannot now deny responsibility for the cost of such service. LiveWorld's CEO testified that the 20 percent figure used to value this service is standard in the industry and far less than the actual cost, on an hourly basis at the fees usually charged for LiveWorld's employees, of providing the service. The Debtor having adduced no contradictory evidence as to the reasonableness of the amount of the fee, the Court finds that the rate is

reasonable and will allow the bandwidth management fee in the amount requested.

### 4. *Electronic Services*

■ LiveWorld seeks a total of $14,067 for "electronic services," which includes three services that LiveWorld contends that it continued to provide to the Debtor, after turnover of electronic control, by agreement with the Debtor.[17] The Debtor objects only to LiveWorld's charges for the first and most expensive of these, which is known as the "Member–to–Member Support Board," at a minimum cost of $10,000 for up to three months. The Support Board (as best I understand it) is a feature of the web site that allows site users to get answers to their requests for help from a database of other users' questions and the answers to them; the Support Board reduces the burden on the servicer of the site of providing those answers again and again. The charge at issue is not for the content of the Board, but only for LiveWorld's continuing to run the Support Board.

The Debtor objects to this charge on the basis that, according to the Debtor, the Support Board belongs to the Debtor, and LiveWorld has no right to charge the Debtor for its own asset. LiveWorld disagrees, saying the Support Board was designed by LiveWorld, after LiveWorld sold the web site to Talk City, to carry out LiveWorld's servicing obligations; it is entirely the creation and intellectual property of LiveWorld. LiveWorld states that the Support Board's code belongs to LiveWorld and (in part) to third parties who have not permitted LiveWorld to license it to others. LiveWorld further states that, although it agreed not to charge the Debtor for the *content* of the Support Board, it

---

17. The parties agreed that, unless the Debtor indicated otherwise, LiveWorld would continue to provide certain services at certain rates.

The Debtor does not deny that it agreed in this manner to LiveWorld's continued provision of the Support Board.

did not agree to continue providing the service—running the Support Board on the web site from LiveWorld's own servers—for free.

The Debtor presented some evidence that it had instigated the development of the Support Board, but the evidence was not credible. The evidence clearly preponderated in favor of a finding that the Support Board was developed by LiveWorld, that the underlying code (if not the content, as to which I make no finding) belongs to LiveWorld and unidentified third parties, and that, unlike the rest of the web site, it has always run off of LiveWorld's own servers. I therefore conclude that LiveWorld's charge for the Support Board is a valid administrative expense. Electronic Services will accordingly be allowed in the full amount requested, $14,067.

### 5. *Requested Services*

LiveWorld's Administrative Expense Request of April 18, 2002 contained a $6,900 charge for certain "requested" electronic services. The Debtor objects to the two largest components of this sum: $4,800 (24 hours @ $200/hr.) for "ad server management problem review," the Debtor stating that "LiveWorld was obligated to return all advertising placement to their pre-January 18th status but did not do so"; and $1,000 (5 hrs @ $200/hr.) for "recoding WebTV bots," the Debtor stating that it never agreed to pay for this service.

The Court will allow the request for compensation for the "ad server management review." The Debtor concedes that, during this time, it had electronic control of the web site and could have fixed the ad server problems itself (and much more efficiently than through LiveWorld). Instead, it used LiveWorld to do this. As the Debtor alleges, LiveWorld had not entirely returned the advertisements to the precise manner in which they functioned before January 18th, and it was this discrepancy that prompted the Debtor to ask for these further services. The Court's Further Order of March 25, 2002, required that, "[a]t the time that LiveWorld provides Talk City with Electronic Access," all www.talkcity.com services shall be fully operational *and restored to the state they were in one January 17, 2002,* including without limitation various system access privileges that were available to Talk City personnel at that time. Further Order, ¶ 10. The purpose of the quoted order was to minimize the Debtor's task of regaining control, not to achieve precise historical restoration, which was virtually impossible;[18] discrepancies were to be expected. The discrepancies here were *de minimus* and clearly (from the start) not a matter of deliberate or bad faith breach of the Further Order by LiveWorld. The Debtor was responsible for fine tuning the site after it regained control. Having elected to use LiveWorld for this effort, it is now obligated to pay for the time and service provided.

The Debtor next contends that it never agreed to pay LiveWorld for the five hours it spent on "recoding WebTV bots." LiveWorld has adduced no evidence as to the Debtor's alleged request for this service. Since the basis on which compensation is sought is that the Debtor requested the service, the lack of evidence on the issue requires that the $1,000 requested for this time be denied.

LiveWorld's Administrative Expense Request of May 21, 2002, contained a $2,300 charge for six "requested" electronic services, and the Debtor objects to all six. The Debtor says it shouldn't have to pay for (a) "rebooting bots," (b) "DNS

---

**18.** Advertisements and other site content naturally change over time.

changes and modification," and (c) "mail server change" because LiveWorld had to take these steps in order to comply with the order to provide the Debtor with electronic access. Nor should it have to pay for (d) "Logging server adjustments in preparation for deactivation," and (e) "Deactivation of Logging Server" because the Debtor requested that LiveWorld stop providing services of its logging server. And the Debtor contends that the sixth item, (f) "tracking 'hwu' security breach"—the "breach" having turned out to be an innocent attempt by the Debtor to locate software that LiveWorld had moved without telling the Debtor—cannot fairly be assessed against the Debtor because it was caused by LiveWorld's failure to provide information to the Debtor. The Court finds that the first five of these items are simply delayed turnover services; the Court will deny them for the same reasons that administrative expense status was denied to turnover services above: they are part of LiveWorld's prepetition claim and therefore are not administrative expenses. As for the sixth, tracking the security breach, for which LiveWorld seeks $400 (2 hours @ $200/hr.), the service was admittedly rendered and necessary to upkeep of the web site. In essence, the Debtor admits that the service is an administrative expense but states that LiveWorld should bear the burden of it because LiveWorld was responsible for the "security breach." The defense is thus an affirmative one, but the Debtor has failed to sustain its burden of proof as to LiveWorld's alleged responsibility for the breach—the Debtor presented little or no evidence on this issue—and therefore the Court will allow compensation as requested for this item.

Therefore, for "Requested Services," the Court will allow $4,800 for ad server management and $400 for tracking the security breach but deny the balance sought.

### 6. *Intellectual Property Licensing Fees*

Lastly, LiveWorld seeks compensation in the amount of $72,000 (72 days @ $1,000 per day) for the Debtor's use of LiveWorld's Retained Web Site Intellectual Property from April 3 though June 13, 2002. The Debtor opposes this request, arguing that LiveWorld materially breached the Web Site Services and Maintenance Agreement before the commencement of this case and, by that breach and operation of the Agreement, effected a transfer of the intellectual property from LiveWorld to Talk City, such that, as of the dates at issue, LiveWorld no longer owned the intellectual property.

The request for this compensation was made by LiveWorld in its last administrative request, filed on June 14 and amended on June 20, 2002. Under this Court's Further Order of March 25, 2002, the Debtor's response to the last request was not due until seven days after the amended motion, the day after the hearing. The Debtor nonetheless filed a response to this request before the hearing but added at the hearing, held on June 26, 2002, that it was not yet prepared to address the request in full, in large part because the components of this request differed in kind from the components of the other six requests. This request, and the Debtor's response to it, appear to require evidence as to the parties' performance and alleged breaches of their Web Site Services and Maintenance Agreement. In view of the late date of this request, its difference in kind from the earlier requests, and its requirement of evidence as to contractual issues that have not otherwise been part of the requests now under consideration, the Court agrees that it would be unfair to the Debtor to adjudicate the intellectual property licensing fees without further opportunity for response and presentation of evidence. Therefore, the Court will deny the licens-

ing fee portion of LiveWorld's request without prejudice as to its renewal in a separate request, to be adjudicated later and separately from the remainder now under consideration.

### Conclusion

For the reasons set forth above, the Court will allow $57,429.48 as administrative expenses,[19] deny without prejudice the $72,200 sought for intellectual property licensing fees, and deny with prejudice the remainder of the amounts requested. A separate order will enter accordingly.

### ORDER ON SEVEN REQUESTS OF LIVEWORLD, INC. FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS

For the reasons set forth in the separate memorandum of decision issued today, the administrative expense claim asserted by LiveWorld, Inc., in its seven Requests for Allowance and Payment of Administrative Expense Claims [1], are hereby allowed to the extent of $57,429.48 as administrative expenses, denied without prejudice as to the $72,200 sought for intellectual property licensing fees, and denied with prejudice as to the remainder of the amounts requested, except that such denial shall be without prejudice to assertion of the portions of those requests that are for turnover services (both establishment of electronic access and physical turnover) as part of LiveWorld's prepetition claim. The Debtor shall pay the allowed amount forthwith to LiveWorld from the fund segregated for payment of LiveWorld's allowed administrative expenses.

19. The total is comprised of the following items:

| | |
|---|---:|
| Bandwidth Payments to UUNet | $31,802.07 |
| Bandwidth Management Services | 6,360.41 |
| Electronic Services | 14,067.00 |
| Requested Services | 5,200.00 |
| TOTAL | $57,429.48 |

1. The seven requests are the following:

| Document | Filing Date | Number | Amount |
|---|---|---|---|
| | 4/12/02 | 61 | $182,916.75 |
| | 4/12/02 | 56 | $ 7,855.00 |
| | 4/18/02 | 64 | $ 14,255.00 |
| | 4/26/02 | 72 | $ 8,562.56 |
| | 5/21/02 | 100 | $ 29,091.92 |
| | 6/12/02 | 130 | $ 1,666.00 |
| | 6/14/02 (amended 6/20) | 137 146 | $198,200.00 |